**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

REVERE PLASTIC SYSTEMS, LLC,                    CASE NO. 3:18 CV 2757

    Plaintiff,

    v.                                          JUDGE JAMES R. KNEPP II

PLASTIC PLATE, LLC,

    Defendant.                                  **MEMORANDUM OPINION AND
                                                ORDER**

### INTRODUCTION

Currently pending before the Court are Plaintiff Revere Plastic Systems, LLC ("Revere")

and Defendant Plastic Plate, LLC's ("Plastic Plate") cross-motions for summary judgment in this

state law breach of contract and conversion case. (Docs. 68 & 69, 73). Jurisdiction is proper under

28 U.S.C. § 1332. For the reasons discussed below, the Court GRANTS summary judgment to

Plastic Plate.

### FACTUAL BACKGROUND

As this Court has previously set forth, after interacting without difficulty under blanket

purchase orders in 2015 and 2016, a dispute developed in 2017. *See* Docs. 43, 60. The facts

themselves are largely undisputed, but the parties disagree about their legal implication.

In 2015, Revere entered a contract as a Tier 1 supplier of washer and dryer parts for

Whirlpool Corporation's "Alpha Program". At Whirlpool's direction, Revere chose Plastic Plate

as a supplier for certain component parts. In March, May, and November 2015, Plastic Plate

provided Revere with quotes for those parts. (Doc. 6-1, at 4, 7, 8-9). The November 2015

production quotation, "Quote # 15-R602G", listed prices, lead time, and certain terms and

conditions related to chrome parts. (Doc. 6-1, at 9). It further listed annual volumes for each part – 175,000 pieces for the Whirlpool Alpha Washer Door Trim Ring, 150,000 pieces for the Whirlpool Alpha Dryer Door Trim Ring, and 325,000 pieces for the Whirlpool Alpha Door Handle. *See id.* The quote contained a list of "Terms/Conditions/Assumptions", including:

> 2.　　Any purchase order issued against this quotation will be considered as acceptance and acknowledgement of our quoted terms & conditions.

> 3.　　All pricing is based on Plastic Plate, LLC being awarded the complete production chrome volume for the Washer/Dryer Trim Ring/Handle and the sourcing of the tooling package listed above.

* * *

> 19.　　PPL commits to firm pricing hold for 5 years at start of first production shipments, assuming that the above stated production volumes meet a minimum EAU of at least 80% (Annual Customer Accepted Part Volumes: Washer Trim Ring – at least 140k; Dryer Trim Ring – at least 130k; Door Handle – at least 260k). If volumes do not meet this level, pricing will need to be reviewed.

*Id.*

In October 2015, Revere issued three Blanket Purchase Orders for chrome parts. (Doc. 1-1, at 21-29). Each referenced Plastic Plate's quote 15-R602G, and noted it was a "BLANKET P.O. ISSUED FOR FUTURE RELEASES-LIFE OF OEM PROGRAM." (Doc. 1-1, at 21, 24, 27). In April 2016, Revere issued three additional Blanket Purchase Orders for white parts. (Doc. 1-1, at 31-39). These did not reference a Plastic Plate quote, but contained the same language stating "BLANKET P.O. ISSUED FOR FUTURE RELEASES-LIFE OF OEM PROGRAM." *Id.* at 31, 34, 37. Attached to each of the 2015 and 2016 purchase orders were two pages of terms and conditions. *See id.* at 22-23, 25-26, 28-29, 32-33, 35-36, 38-39. Revere issued releases, and Plastic Plate shipped the quantities requested.

In early 2017, Whirlpool decided to re-source the Alpha Program parts supplied by Plastic Plate to a different Tier 2 supplier. (Doc. 1-1, at 8; Doc. 6, at 10-11). Emily Klug of Whirlpool

2

informed David McNulty of Plastic Plate of this directly by email. (Doc. 74-3). Plastic Plate confirmed with Revere. *See* Doc. 72-5; Doc. 71-9. Plastic Plate, in an April 2017 email from Ryan Lacks, Director of Sales & Marketing, told Revere it believed Revere breached their contract because "Plastic Plate agreed to firm pricing for the life of this program in exchange for a commitment that Plastic Plate would receive a blanket P.O. for the life of the OEM (Whirlpool) program. This was the subject of negotiation and an express understanding between the parties as is reflected in the Orders." (Doc. 71-10, at 2). Plastic Plate said it would honor all firm releases received from Revere on April 24, 2017 at current pricing, would not manufacture any product for releases received after that date, and would "require payment in advance for any firm releases currently in process before proceeding with manufacture for shipments beyond April 26, 2017." *Id.* Archie Meyers, Vice President of Finance for Revere, responded that Revere did not believe itself to be in breach as "[t]here has been no change in [its] order or payment pattern" and Revere "has not given any notice of cancellation"; he explained that Plastic Plate – by withholding shipment – was itself in breach. (Doc. 74-4).

Lacks then requested Laura Price, Director of Sales for Revere, "send an email confirmation that PPL will have the Alpha '16 Chrome and MIC White program for the life of the OEM program." (Doc. 71-11, at 2). He further requested cash in advance for shipments going forward. *Id.* Price said "Revere will continue to honor our current purchase orders we have in place with you today." *Id.* Plastic Plate sought assurances from Whirlpool – through Revere – that it would remain the Tier 2 supplier for the life of the program. (Doc. 71-12). Whirlpool responded – through Revere – that it "does not direct Revere to use any particular T2" for these parts. (Doc. 71-13). Plastic Plate then asked Revere to confirm that Plastic Plate "will be retaining 100% of the program through the end of the volume production, which will be sometime in Jan-Mar 2018."

(Doc. 72-6). Per Revere, "[t]he parties eventually resolved their 2017 dispute with Plastic Plate agreeing to honor the terms of the then governing 2015 and 2016 contracts and purchase orders." (Doc. 73, at 15).

In early October 2017, Lacks asked Revere "when PPL can anticipate that the Alpha Chrome/White Doors and Handle will end production". (Doc. 74-9). Revere Sales Manager Todd Countess said Whirlpool was expecting to phase out the program in June 2018. *Id.* Later that month, Revere issued six updated Blanket Purchase Orders to Plastic Plate for the Alpha Program. *See* Doc. 1-1, at 41, 44, 47, 50, 53, 56. Three were for chrome parts, and again referenced Plastic Plate's quote number "15-R602G" (*id.* at 41, 44, 47); three were for white parts and did not reference a Plastic Plate quote (*id.* at 50, 53, 56). These Blanket Purchase Orders again listed the unit cost for one of the identified part (but no order quantity term), and again said it was a "BLANKET P.O. ISSUED FOR FUTURE RELEASES", but eliminated the prior "LIFE OF OEM PROGRAM" language. *Id.* at 41, 44, 47, 50, 53, 56. They were otherwise identical to the prior Blanket Purchase Orders. *Compare* Doc. 1-1, at 21, 24, 26, 31, 34, 37 *with* Doc. 1-1, at 41, 44, 47, 50, 53, 56. Meyers directed the "life of program" language be removed. (Doc. 72-8, at 2); (Doc. 72-4, at 8-11). He understood Plastic Plate believed that language entitled it to production for life of the program. (Doc. 72-4, at 8).

Each Blanket Purchase Order further stated that "IN ACCORDANCE WITH OEM CONTRACTS, PRICE CHANGES WILL ONLY BE ALLOWED AT THE BEGINNING OF THE QUARTER OF CALENDAR YEAR OR AS CONTRACTS PERMIT." (Doc. 1-1, at 41, 44, 47, 50, 53, 56). Accompanying each 2017 Blanket Purchase Order were two pages of "Terms and

Conditions" (identifying Revere as "Buyer", and Plastic Plate as "Seller"), which contained the

following provisions[1]:

    1.    **OFFER AND ACCEPTANCE**. This Purchase Order constitutes an offer by Revere Industries, LLC (the "Buyer") to purchase from the addressee (the "Seller") the goods or services identified on the Purchase Order on the terms and conditions set forth below. This is not a firm offer, and Buyer may revoke it at any time prior to acceptance by Seller. Seller's acknowledgment of the Purchase Order, shipment of any goods, or commencement of work pursuant to the Purchase Order shall be deemed an acceptance of this Purchase Order and all its terms and conditions. ***

    2.    **PURCHASE PRICE AND PAYMENT**. The purchase price of the goods or services is as set forth on the Purchase Order or if no purchase price is there stated, the purchase price shall not be higher than the lowest of the price last (a) quoted; (b) charged to Buyer; or (c) marked price. In any case, the purchase price is a firm price and is not subject to increases in the prices of Seller's manufacturers or suppliers, or due to any other act or event. * * * Unless otherwise specified on the Purchase Order, Buyer shall pay for the goods 60 days after receipt of invoice.

    3.    **ATTACHMENTS**. Documents designated by Buyer in the body of the Purchase Order, including supplemental terms and conditions, if any, are incorporated by reference the same as if set out in full therein.

    4.    **CHANGES**. The Buyer reserves the right at any time to issue a written change order or amendment to the Purchase Order concerning any of the following: (a) specifications, drawings, and data incorporated in the Purchase Order where the items to be furnished are to be specially manufactured for the Buyer; (b) quantity; (c) methods of shipment or packaging; (d) place of delivery, (e) time of delivery; or (f) any other matters affecting this Purchase Order.

    5.    **TERMINATION**. Buyer may terminate the Purchase Order for its convenience, in whole or in part, at any time prior to shipment by (written or electronic) notice to Seller. ***

* * *

    16.    **BUYER'S TERMS AND CONDITIONS APPLY**. No modification or release from this Purchase Order shall be binding unless agreed to in writing by the parties and specifically labeled as a modification or release. Unless specifically

---

1. These Terms & Conditions were unchanged from the 2015/2016 Blanket Purchase Orders. *Compare* Doc. 1-1 at 23-23, 25-26, 28-29, 32-33, 35-36, 38-39 *with* Doc. 1-1, at 42-43, 45-46, 48-49, 51-52, 54-55, 57-58.

agreed to otherwise by Buyer and Seller, these terms and conditions supersede any submitted by Seller in any proposal or acknowledgement.

\* \* \*

21.  **REMEDIES**. In the event this Purchase Order is not complied with in any respect, Buyer may exercise any one or more of the following remedies: (a) cancel this Purchase Order; (b) require replacement of the goods; (c) recover all loss, damage and expense (including consequential damages) resulting from such failure by set-off or otherwise; (d) return excess of early deliveries to Seller at Seller's expense; (e) require delivery by any means and (f) exercise any other available remedy. Seller shall pay or otherwise be liable for any transportation, labor and/or other expense incurred in connection with the foregoing, including Buyer's attorneys' fees, costs and other changes incurred in connection with Buyer's exercise of Buyer's remedies.

\* \* \*

26.  **ENTIRE AGREEMENT**. Unless superseded by a specific signed agreement between Buyer and Seller, this agreement shall include the Purchase Order, these General Terms and Conditions, and all attachments referred to in the Purchase Order or in the General Terms and Conditions, and it shall constitute the entire agreement of the parties with regard to the subject matter contained herein. All other prior or contemporaneous representations, warranties, covenants, or agreements between Seller and Buyer, or their representatives, with respect to the subject matter are hereby superseded. The term "Purchase Order" as used herein means the first and continuation pages of Revere's completed Purchase Order form, including any special provisions contained therein. This agreement may not be modified except by mutual written agreement of the parties.

*Id*. at 42-43, 45-46, 48-49, 51-52, 54-55, 57-58.

Laura Parr of Revere emailed these updated Blanket Purchase Orders to Ashlee Haynes at Plastic Plate. (Doc. 71-14, at 1, 5-7, 10-12, 15-17, 20-22, 25-27, 30-32.)[2] A set of releases, each entitled "Supplier Release Planning Schedule" accompanied the orders. *See id.* at 3-4, 8-9, 13-14, 18-19, 23-24, 28-29. Some of these releases were issued against the prior Blanket Purchase Orders, and some (with shipment dates starting in January 2018) were issued against the attached new

---

2. In 2015, Lacks requested that Parr send all purchase orders to Plastic Plate's Director of Business Development, Kevin Leland, and she agreed to do so. (Doc. 71-5, at 2); (Doc. 72-2).

Blanket Purchase Orders. *See id.* The releases citing the new purchase orders set forth only "forecast"[3] quantities for each part for the month of January 2018. *See id.* at 4, 9, 14, 19, 24, 29. Plastic Plate continued to ship products to Revere as requested.

On January 22, 2018, Plastic Plate (in an email from Lacks) told both Revere and Whirlpool it would "no longer support the extended production of the Alpha '16 Door Rings and Handle". (Doc. 74-10). That same day, Parr, on behalf of Revere, sent updated releases to Haynes at Plastic Plate with firm quantities through February 2018 and forecast quantities through late April 2018. (Doc. 72-10). On January 29, 2018, Revere again sent updated releases, this time with firm quantities from mid-February to early March 2018, and forecast quantities through early May. (Doc. 72-12).

Apparently having received no response to his prior email, Lacks followed up on January 31, 2018, saying Plastic Plate would "not be shipping any product beyond March 31, 2018." (Doc. 74-10). He stated the quantities of each part (per the January 29 releases) Plastic Plate intended to ship through that date. *Id.*

On February 25, 2018, Kevin Leland of Business Development at Plastic Plate told Revere by email that Plastic Plate had continued to provide product "without clear direction from Whirlpool . . . as to if PPL will continue to be a source for the program and for how long such continuation will last". (Doc. 74-11). Leland said Plastic Plate would continue to ship, but listed increased prices beginning April 1, 2018, with a further increase on May 1, 2018 if further product was required. *Id.* The April prices listed were double the previous prices and the May prices were triple. *Compare* Doc. 74-11 (new prices) *with* Doc. 6-1, at 9 (original prices in Plastic Plate quote 15-R602G). Laura Price testified "Revere couldn't sustain that substantial amount of increase that

---

3. A forecast is a possible future order from a customer. *See* Doc. 73-24, at 16.

they had requested." (Doc. 72-13, at 3) (the "end customer [Whirlpool] wouldn't allow a price increase and Revere couldn't sustain that").

In early March 2018, Revere requested a quotation from another company, A-Brite, to manufacture the parts. (Doc. 71-19, at 4-5). A-Brite did not do in-house molding, so Revere molded the parts itself, and hired A-Brite to plate the three chrome parts. (Doc. 72-13, at 7-8).

On March 14, Leland told Price, Parr, and Countess by email that Plastic Plate had received releases the prior evening citing the prior pricing. (Doc. 74-12). He wrote orders at prior pricing "are specifically rejected for all deliveries after March 31, 2018." *Id.* He again said that, for shipments after March 31, 2018, "Revere must agree in writing to the new pricing proposed by PPL and must pay in advance for all shipments going forward." *Id.*

On March 19, Price told Leland by email that Revere "has not cancelled or notified PPL of any intent to cancel the Blanket Purchase Orders" and that the "agreement clearly requires PPL to continue to ship product to Revere under the existing terms and pricing until at least June of 2018." (Doc. 74-14). She noted if Plastic Plate refused to ship "it will cause significant damages to Revere and a possible supply interruption to Whirlpool." *Id.*

On March 22, Revere issued additional releases with firm quantities through late April 2018, and forecast quantities through mid-June. (Doc. 73-18).

The following day, Leland told Price, Parr, and Countess by email that Plastic Plate had not received updated purchase orders and requesting all open invoices be paid in full. (Doc. 74-18). He said once all outstanding invoices were paid in full, Plastic Plate would "have all customer owned tooling available for pick up on April 2". *Id.*

On March 26, Price again told Leland by email that "Revere did not cancel or notify PPL of any intent to cancel the Blanket Purchase Orders at issue" and that Plastic Plate's refusal to ship

8

without an increase in price was "an attempt by PPL to unilaterally change the terms of our Agreement, and a breach of our Agreement." (Doc. 74-15).

Plastic Plate continued shipping, fulfilling quantities requested by firm releases, through March 2018. *See* Doc. 72-11 (invoices showing shipments from January 30 to March, 30 2018).

Revere completed the re-sourcing with A-Brite and continued to supply Whirlpool without interruption to Whirlpool. (Doc. 72-3, at 12-13).

Chrome Plating Tooling

As part of its initial agreement with Revere, Plastic Plate agreed to supply the tooling required for chrome plating the parts. *See* Doc. 6-1, at 9 (price quote), Doc. 79-6 (order including tooling). The general process of chrome plating consists of a plastic part being clipped to a metal structure (the "rack"), which is then attached (with "hooks") to a horizontal metal bar (the "flight bar") for the plating process. (Doc. 71-24, at 11-12). Michael Hall, who was in charge of rack maintenance for Plastic Plate, testified Plastic Plate uses an "insert/frame" rack system that Hall designed. *Id.* at 14.[4]

The chrome plating inserts at issue here consisted of a square metal frame, to which three metal clips are affixed to the center of three of the four sides. *See* Docs. 71-26, 71-27. The clips hold the molded plastic part as it goes through the plating process. *See* Doc. 71-24, at 17. Further attached to the inserts at issue were two horizontal cross-members to which were connected five attachment arms. *See* Doc. 71-27. These attachment arms were attached to the cross-bars by one or two bolts. *See* Doc. 73-20, at 7. These attachment arms connected the plating inserts to a larger frame which held multiple chrome plating inserts. *See* Doc. 71-29. This larger frame was

---

4. Plastic Plate's system is in contrast to a "conventional rack" system, which is "just the rack that has the cross bars and the clips mounted to it already" which can then "be hung on the flight bar and ran as is". (Doc. 71-24, at 11-12); *see also* Doc. 71-25 (photograph of conventional rack).

connected, with hooks, to a flight bar, which carried everything through the chrome plating process. *See id.*; Doc. 71-14, at 12-18.

Price testified she was not an expert on plating, and Revere did not do plating of plastic parts. (Doc. 72-13, at 15). When asked whether she had personal knowledge "as to whether one plater can use another plater's racks", Price said: "The question came up when we did send out the quotes, if there was existing racks. So I would assume some platers have the capabilities to reutilize existing racks, but only based on that. I can't speak to it, no." *Id.* at 15-16. She testified she was not aware of whether other platers could use Plastic Plate's specific inserts; she understood a part of the inserts was removed, and "if they were part of the actual rack that Whirlpool paid for previously, I would assume they would be Whirlpool owned, but again, I don't know their design." *Id.* at 16-17.

Madhu Krishnamoorthy, a representative from Whirlpool, did not recall Whirlpool ever taking ownership of a plating rack. (Doc. 72-15).

Hall testified "Revere would have bought the insert frame and three clips", but did not buy the cross-members and attachment features. (Doc. 71-24, at 9-10). Hall testified Plastic Plate's Alpha Program Quote included "[j]ust the outside frame and the three clips"; the quote did not include the cross-member or attachment features because "[t]he attachment features are [his] design and they are Plastic Plate's." *Id.* at 17. He further testified Plastic Plate reuses the attachment arms for other programs. *Id.* Plastic Plate provided the previously-manufactured attachment arms to American Rack, who attached them to the chrome plating racks it manufactured at Plastic Plate's direction. *Id.* at 5.

In his January 22, 2018 email, Lacks "request[ed] that [Revere] make arrangement to have all Whirlpool owned tooling exited from PPL facilities". (Doc. 74-10).

10

In her March 26, 2018 email, Price listed certain "Injection Mold tooling and Racking" and stated: (1) "[n]one of this is owned by or the property of PPL", and (2) "PPL clearly does not need this tooling and racking for the product it has agreed to ship to Revere on or before March 31, 2018." (Doc. 74-15), She further stated that: "In order to prevent significant and *additional* damages to both Whirlpool and Revere, Revere is demanding PPL to release all above mentioned tooling to Revere by the close of business tomorrow—March 27th." *Id.* (emphasis in original).

Before returning the tooling to Revere, Plastic Plate employees – at Hall's direction – used a reciprocator saw to remove the cross-members with the attachment arms attached. (Doc. 73-20, at 10-11); *see also* Doc. 1-1, at 60-63 (photographs of returned tooling).

On July 30, 2018, Whirlpool assigned to Revere "the right to pursue any cause of action relating to the conversion of and/or damage to" the tooling for the Alpha Program. (Doc. 74-17).

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

DISCUSSION

Both parties assert they are entitled to summary judgment on Revere's remaining claims. For the reasons discussed below, the Court concludes Plastic Plate is entitled to summary judgment on all claims.

Breach of Contract

Revere asserts Plastic Plate materially breached the parties' 2017 agreement when it: (1) demanded cash in advance; and (2) refused to continue shipping absent an increase in price. Plastic Plate responds that – given this Court's prior Order finding there was no requirements contract – it had no continuing obligation to ship parts, and thus there was no breach. For the reasons discussed below, the Court find Plastic Plate is entitled to summary judgment on Revere's breach of contract claims.

The preliminary – and ultimately dispositive – question is whether Plastic Plate had a contractual obligation to supply Revere at the time of Plastic Plate's actions that Revere characterizes as a breach. Under Ohio law, essential elements of a contract include: an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained-for legal benefit or detriment). *Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004) (citing *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)). Contract interpretation is a question of law. *Maurer v. Joy Technologies*, 212 F.3d 907, 914 (6th Cir. 2000). And "[t]he intent of the parties is best determined by the plain language of the contract." *U.S. v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003).

Under Ohio law – which mirrors the Uniform Commercial Code ("UCC") – a purchase order constitutes an "offer to buy goods for prompt or current shipment" and "invit[es] acceptance by any manner and by any medium reasonable in the circumstances". Ohio Rev. Code § 1302.09;

12

*see also Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1300 (Ohio Ct. App. 1982) ("Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller.").

Further, to be enforceable under the UCC, a contract for the sale of goods requires a quantity term. *See Tubelite Co., Inc. v. Original Sign Studio, Inc.*, 891 N.E.2d 820, 825 (Ohio App. 2008); *see also H&M Landscaping Co., Inc. v. Abraxus Salt, LLC*, 2010 WL 3441935, at *3 (Ohio App.) ("Quantity is generally the only term that is required for contract formation.") (citing Official Comment One to Ohio Rev. Code § 1302.04 ("The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. * * * Only three definite and invariable requirements as to the memorandum are made by this subsection. * * * [T]hird, it must specify a quantity.")). Alternatively, "[t]he UCC allows parties to a contract, rather than specifying a quantity, to measure the quantity of goods by the good-faith output of the seller or the good-faith requirements of the buyer". *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 41 N.E.3d 915, 923–24 (Ohio App. 2015).

With this background, the Court begins its analysis with the relevant documents and its prior determinations. The 2017 Purchase Orders each stated: "BLANKET P.O. ISSUED FOR FUTURE RELEASES"; they listed unit costs for each part, but no quantity. Three were for chrome parts and referenced Plastic Plate's quote number "15-R602G" (*id.* at 41, 44, 47); three were for white parts and did not reference a Plastic Plate quote (*id.* at 50, 53, 56). Plastic Plate's quote number 15-R602G, included the terms quoted above, that pricing was based on Plastic Plate "being awarded the complete production chrome volume for the Washer/Dryer Trim Ring/Handle", and that Plastic Plate "commits to firm pricing hold for 5 years at start of first production shipments" assuming certain production volumes. (Doc. 6-1, at 9). As previously stated, these 2017 purchase

13

orders eliminated language previously included in the 2015 and 2016 purchase orders regarding the "LIFE OF OEM PROGRAM" and contained two pages of attached terms and conditions.

In addressing Plastic Plate's counterclaim for breach of contract – which was based, in part, on an argument that Revere had an obligation to purchase parts exclusively from Plastic Plate – this Court explained:

> Revere presented Plastic Plate with twelve separate Purchase Orders (Doc. 1-1, at 21-58), which Plastic Plate 'accepted' *individually* through performance by shipping the products in the type and quantity requested by *each* separate order (Doc. 1-1, at ¶16, 20, 26, 32-33). Thus, the Court previously determined Revere's six Purchase Orders which reference Plastic Plate quote 15-R602G (Doc. 1-1, at 21, 24, 27, 41, 44, 47), were *six separate contracts* each consisting of: (1) the quote; and (2) the Purchase Order.

(Doc. 60, at 13) (emphasis in original); *see also* Doc. 43, at. 10-11. This language was, regrettably, overly broad and imprecise. It was directed at this Court's rejection of Plastic Plate's "single supply agreement" and "non-resourcing agreement" arguments (that is, Plastic Plate's argument that it had a requirements contract with Revere). The Court held that, once Plastic Plate began shipping under the 2017 Blanket Purchase Orders, it could no longer argue the language "LIFE OF OEM PROGRAM" language applied to the parties' dealings.

What the Court's prior language neglected to clarify is that the acceptance-through-performance specified was not the shipping of goods under each Blanket Purchase Order (because the Blanket Purchase Orders *themselves* contained no quantity information, *see* Doc. 1-1, at 41, 44, 47, 50, 53, 56), but the shipment of goods as requested in each release issued under the Blanket Purchase Order. Those releases specified the shipment dates and quantities. *See, e.g.*, Doc. 71-14, at 3-4, 8-9, 13-14, 18-19, 23-24, 28-29 (October 2017 releases); Doc. 72-10 (January 22, 2018 releases), 72-12 (January 29, 2018 releases).

14

Revere asserts – and Plastic Plate acknowledges this Court held – that the 2017 Blanket Purchase Orders (and Plastic Plate's quote, where referenced) formed the basis of the parties' agreement and replaced earlier agreements under the 2015-2016 Blanket Purchase Orders. Revere argues that Plastic Plate anticipatorily repudiated this agreement by refusing to ship beyond March 31, 2018 absent payment in advance and increased prices. Where Revere's argument fails is the presumption that Plastic Plate had an ongoing contractual obligation to continue shipping.

Prior to the issuance of a release, the Blanket Purchase Order contained no specific quantity term. *See, e.g.*, Doc. 1-1, at 41, 44, 47, 50, 53, 56. That this Court previously held that Plastic Plate "accepted" the 2017 Blanket Purchase Order by shipping against it – thus finding the terms of the 2017 Blanket Purchase Order were controlling as to any shipments made thereunder (and that Plastic Plate could not assert that there was a "single supply contract") – does not equate to a finding that Plastic Plate was required to accept any release subsequently issued. Nor has Revere pointed to any contractual obligation for Plastic Plate to do so.

In a factually analogous case from the Seventh Circuit, Judge Richard Posner, writing for the court, explained that where buyers were not obligated to purchase from suppliers, those suppliers conversely did not have an obligation to supply, and therefore a supplier's decision to stop supplying was not a breach of contract. *In re Modern Dairy*, 171 F.3d 1106 (7th Cir. 1999). There, school districts solicited bids for milk to supply schools "and the bid specifications provided that the milk would be supplied in quantities to be determined by the district's food manager"; "[t]he specifications contained an estimate of the quantities likely to be demanded." *Id.* at 1108. The dairy submitted bids, which the district accepted and issued purchase orders against for "milk products for the 1996/97 year as per your bid" and "to be ordered throughout the 1996-97 school year . . . as per . . . your bid quotation." *Id.* (omission in original). The dairy delivered some milk,

15

but "ceased deliveries in October 1996, well short of the end of the school year (indeed quite near the beginning)." *Id.* The parties disputed whether the dairy's actions constituted a breach. The Seventh Circuit found the agreement was not a requirements contract because "[n]othing in the scanty documents that record the parties' deal explicitly requires the school districts to take all, or indeed any, of their milk needs from the dairy." *Id.* The court contemplated whether the parties had a "buyer's option", that is, an agreement whereby the suppliers were obligated to supply, even if the buyers had no obligation to buy. *Id.* at 1108-10. But the school districts did not show that the requirements for a buyer's option was satisfied (citing UCC 2-205) and the Seventh Circuit held: "[t]heir case stands or falls on whether they were obligated to buy all their milk requirements from Modern Dairy. There is no evidence that they were, and so they lose." *Id.* at 1110. Because the school district was not "committed to buy their entire milk requirements from the dairy", the dairy was correspondingly not "obligat[ed] to supply those requirements." *Id.* at 1109.

The same is true here. Had Revere wanted to obligate Plastic Plate to continue to supply parts for a specified period of time, it could have done so through either a requirements contract, or a firm offer/buyer's option. It did neither. Revere argued – and this Court previously held – that the parties did not have one "single supply contract" and that Revere had no obligation to purchase from Plastic Plate under the terms of the 2017 agreement which eliminated the "LIFE OF OEM PROGRAM" language from earlier purchase orders. *See* Doc. 43, at 10-15; Doc. 60, at 13-17. That is, this was not a requirements contract. Nor does Revere point to elements of the parties' agreement suggesting it had a buyer's option. *See* Ohio Rev. Code 1302.08 (UCC 2-205) ("An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three

16

months; but any such term of assurance on a form supplied by the offeree must be separately signed by the offeror."); *see also* Doc. 1-1 at 42, 45, 48, 51, 54, 57 ("This is not a firm offer, and Buyer may revoke it at any time prior to acceptance by Seller.").

Because it was not a requirements contract, nor was it a buyer's option, any "agreement" contained no quantity term until Revere issued releases for "firm" quantities. *See, e.g.*, *H & C Ag Servs, LLC*, 41 N.E.3d at 927 ("The Agreement is unenforceable as a matter of law because it unambiguously lacks an essential quantity term."). Thus, there was no contract to enforce until Revere issued a release for a firm quantity, and Plastic Plate accepted. Revere contends that blanket purchase orders are "a term of art in supply chain contracts", arguing "[a]s another court has explained, 'blanket purchase orders . . . put sellers on notice of roughly how much a buyer intends to purchase over a given time period.'" (Doc. 90, at 6-7) (quoting *Warren Indus., Inc. v. PMG Ind. Corp.* 2014 WL 12585775, at *6 (E.D. Mich.)). But neither of those terms – quantity or duration – was included in Revere's Blanket Purchase Orders at issue.

Further, the language to which Revere points in the Blanket Purchase Orders – that they were "ISSUED FOR FUTURE RELEASES" (Doc. 1-1, at 41, 44, 47, 50, 53, 56) – does not change this analysis. *See Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, 2007 WL 3071676, at *5 (S.D. Ohio) ("[W]here there is a blanket purchase order in effect, but material releases are issued which govern supply and delivery, the only contracts are the releases that have been accepted between the parties.") (citing *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 1995 U.S. App. LEXIS 1047 (6th Cir.) (table)). *Harris Thomas Industries* involved a blanket purchase order that said "see your separate Scheduling Agreement Release for detailed quantities and dates." 2007 WL 3071676, at *5. *Advanced Plastics* addressed a blanket purchase order that said the seller agreed to supply "the goods or service covered by this Purchase Order to the extent of and in

17

accordance with . . . . Buyer's written instructions", where the "written instructions" were subsequent releases. 1995 U.S. App. LEXIS 1047, at *5. In both cases, the courts found the releases governed the parties' agreements, not the blanket purchase orders independent of the releases. *See Harris Thomas Indus., Inc.*, 2007 WL 3071676, at *5 ("The separate Releases, not the Blanket Purchase Order governed the contractual obligations of the parties."); *Advanced Plastics Corp.*, 1995 U.S. App. LEXIS 1047, at *5 ("The language of this document clearly demonstrates that the parties intended for White Consolidated to purchase quantities of parts only according to its releases, and not according to its requirements.").

Likewise, here, the language that the Blanket Purchase Order was issued "for future releases" contemplated that the future releases would set the quantities. *See Harris Thomas Indus., Inc.*, 2007 WL 3071676, at *5 ("[T]he language of the Scheduling Agreement clearly demonstrates that the parties intended for SF Lemforder to purchase quantities of parts only according to its later-issued releases."); *see also Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp 214, 217 (W.D. Mo. 1977) ("The purchase order constituted merely an offer or invitation for orders which could be revoked by plaintiff at any time prior to acceptance by receipt of an order for a specific amount from defendant.").[5] Here, although Plastic Plate accepted the terms of the 2017 Blanket Purchase Order as to those firm releases it shipped, nothing in the documents exchanged between the parties obligated Plastic Plate to continue shipping any specific quantity for any specific period of time.

---

5. Revere attempts to distinguish *Propane Industries* by arguing the supplier there refused to supply *prior to* any shipment under the blanket purchase order. But, although Revere is correct about the facts of *Propane Industries*, nothing in the court's analysis suggests that it turned on the timing of the refusal to ship. *See* 459 F. Supp. At 220-21.

Revere further argues this renders meaningless certain terms in the Blanket Purchase Orders and Plastic Plate's quote, such as the projected annual volumes listed in Plastic Plate's quote, the five year pricing commitment, and statements regarding specific timing, such as only permitting price changes "at the beginning of the first quarter of the calendar year." Revere is correct that these terms seem to suggest that at some point, the parties contemplated an ongoing relationship, but these terms still do not obligate Plastic Plate to ship any particular quantity of goods for any particular time because they do not come into effect until a firm release, with a specific quantity, was accepted by Plastic Plate. *See Sundram Fasteners, Ltd. v. Flexitech, Inc.*, 2009 WL 3763772, at *8 (E.D. Mich.) (because contract was not a requirements contract, blanket purchase order "did not commit [the buyer] to purchase, or [the seller] to sell any specific quantity of [parts]", and "[t]he obligation to manufacture or ship parts arose only after [the seller] had received a release from [the buyer]").,

Revere's argument to the contrary is unpersuasive. Revere contends that the parties formed a contract the first time Plastic Plate shipped the first amount requested by a firm release under the 2017 Blanket Purchase Order in January 2018. It thus contends at that point, Plastic Plate was obligated to continue shipping each time Revere issued a firm release and bound by the terms and conditions attached to the blanket purchase orders. Revere cites two orders from the same case to support this proposition. *See Sundram Fasteners, Ltd. v. Flexitech, Inc.*, 2009 WL 2351763 (E.D. Mich.), *Sundram Fasteners Ltd. v. Flexitech, Inc.*, 2009 WL 3763772 (E.D. Mich.). The legal issues presented by *Sundram Fasteners* are distinguishable. There, the parties similarly operated under a blanket purchase order and releases. At some point, the buyer simply stopped sending releases. The seller, having continued to manufacture parts, sued alleging the buyer had failed to compensate it for these parts. The court explained that because the contract was not a requirements

contract, the blanket purchase order "did not commit [the buyer] to purchase, or [the seller] to sell any specific quantity of [parts]", and "[t]he obligation to manufacture or ship parts arose only after [the seller] had received a release from [the buyer]", there was no breach of contract and the buyer was not required to pay for the parts left in the supply chain:

> Under a blanket purchase order, the purchaser is responsible for purchasing only quantities that are the subject of firm releases. Forecasts are nothing more than forecasts, and do not create a legal obligation to purchase. Flexitech performed its contractual duties by paying for all of the bolts for which it issued firm releases. Thus, it was not liable for any additional bolts that Sundram claims were left in the supply chain.

2009 WL 3763772, at *8-9. *Sundram Fasteners* thus addresses the factual situation of a blanket purchase order with releases against which a seller ships and a buyer's obligations thereunder. It does not directly speak to the question of whether there is an obligation under the blanket purchase order itself for the seller to continue to accept and ship against releases.[6] That is, when a seller ships under a release based on a blanket purchase order, that seller accepts terms contained therein, but that is different than a holding that by shipping against one (or more) releases, the seller was obligated to continue to do so. "Accepting" the terms of a Blanket Purchase Order for firm releases

---

6. Revere quotes (Doc. 90, at 7) the following portion of the earlier *Sundram Fasteners* opinion:

> Plaintiff does not dispute that it shipped Defendant the bolts requested via releases for nearly one year, and that Defendant paid for the released shipments. Thus, when Plaintiff sent its first shipment in March of 2006, by the act of tendering performance, it accepted the terms of Defendant's blanket purchase order. *Id.* The fact that Plaintiff did not choose one of multiple methods of acceptance listed in the purchase order does not create a genuine issue of material fact as to whether Plaintiff accepted the blanket purchase order and its incorporated terms and conditions.

*Sundram Fasteners, Ltd.*, 2009 WL 2351763, at *4. But again, this language is directed at a dispute over whether the terms of the blanket purchase order governed releases shipped and paid for thereunder, not whether there was an ongoing obligation to ship – the factual situation at issue here.

received, accepted, and shipped, does not speak to any underlying obligation to continue to ship for any particular time period where the contract does not otherwise supply such an obligation.

Because the terms and conditions were not applicable until Plastic Plate accepted a firm release, Plastic Plate's demands for cash in advance or increased pricing for future shipments are not breach of any contract, but rather more properly characterized as counteroffers.. *See Harris Thomas Indus., Inc.*, 2007 WL 3071676, at *5 ("[W]here there is a blanket purchase order in effect, but material releases are issued which govern supply and delivery, the only contracts are the releases that have been accepted between the parties."). The Court agrees with Plastic Plate that Revere's argument that Plastic Plate was obligated to continue to supply for a defined period of time (Revere takes pains to point out that Plastic Plate knew the program was likely to continue to June 2018) would require the Court to read back into the contract the duration term that Revere intentionally took out: "LIFE OF OEM PROGRAM". This it will not do. Revere won the battle, so to speak, on Plastic Plate's counterclaim, but as a result, it loses the war it began on its own breach of contract claim.

Revere's Blanket Purchase Orders contained no quantity or duration term. Revere has not pointed to any language in the 2017 Blanket Purchase Order or incorporated price quote that obligated Plastic Plate to continue to accept and ship against releases. Revere made great effort – first by eliminating the "LIFE OF OEM PROGRAM" language, and then by successfully arguing that the contract was not a requirements contract – to ensure that it had no contractual obligation to purchase parts from Plastic Plate. In so doing it achieved a Pyrrhic victory[7] as, for the reasons

---

7. "The term 'Pyrrhic victory' refers to the ancient Greek King Pyrrhus, whose army suffered great losses while winning battles against the Romans in 279–280 BC during the Pyrrhic War. Given those losses, the 'victory' was tantamount to defeat." *Pitcher v. Waldman*, 2014 WL 1302551, at *10 (S.D. Ohio) (citing *Beauharnais v. Illinois*, 343 U.S. 250, 275 (1952) (dissent by Justice Black,

stated above, Plastic Plate is now entitled to summary judgment on Revere's breach of contract claims.[8]

Conversion / Unjust Enrichment / Civil Theft

Both parties contend they are entitled to summary judgment on Revere's conversion claim and Plastic Plate further contends it is entitled to summary judgment on Revere's unjust enrichment and civil theft claims. Revere contends Plastic Plate destroyed Whirlpool-owned property (the chrome plating "racks") and that Whirlpool assigned this claim to Revere. Plastic Plate argues Revere – standing in Whirlpool's shoes by assignment – has not demonstrated a genuine issue of material fact as to any element of conversion. For the reasons discussed below, the Court finds Plastic Plate entitled to summary judgment on the conversion claim.[9]

The Ohio Supreme Court has defined conversion as "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Jones v. Gen. Motors Corp.*, 49 Ohio St. 3d 93, 96

_____

advising the prevailing parties to "consider the possible relevancy of this ancient remark: 'Another such victory and I am undone.'")).

8. Plastic Plate's Motion for Leave to File a Sur-Reply (Doc. 91) is DENIED. Given the conclusions stated above, the Court need not reach the arguments raised therein.

9. Preliminarily, the Court must resolve a dispute over the evidence presented on this claim. In support of its motion for summary judgment, Plastic Plate attached a June 30, 2020 Declaration of Andrew Wasco, Vice President of Global Sales for the Plasman Group, which includes A-Brite Plating, the company from which Revere obtained the parts after Plastic Plate stopped. *See* Doc. 72-14; Doc. 71, at 23 (citing Doc. 72-14). Revere objects, arguing the Declaration is inadmissible because Wasco was never disclosed as a witness, and because it contains hearsay and lacks foundation. (Doc. 78, at 19). Plastic Plate responds that this is "false outrage" because, *inter alia*, A-Brite was discussed frequently during discovery and Revere identified as witnesses all person identified in documents produced during discovery. (Doc. 87, at 21 n.9).

Federal Rule of Civil Procedure 37(c)(1) provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Plastic Plate has not convinced this Court that the failure to disclose Wasco as a witness was substantially justified or harmless. As such, the Court grants Revere's request to strike the Wasco Declaration, and does not consider it in the below analysis.

(1990). The essential elements of a conversion claim are: (1) plaintiff's ownership or right to possess the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property; and (3) damages. *Kuvedina, LLC v. Cognizant Tech. Sol.*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013) (citing *Haul Trans. of VA, Inc. v. Morgan*, 1995 WL 328995, at *3 (Ohio App.)). "When a defendant to a conversion claim moves for summary judgment, the court should grant the motion if the plaintiff fails to produce evidence on any of" these three elements. *Minix v. Collier*, 1998 WL 154540, at *4 (Ohio App.).

Plastic Plate contends first, that the assignment from Whirlpool to Revere lacks consideration and is thus invalid, and second, that Revere has failed to present evidence to establish any of the three elements of conversion. The Court finds it unnecessary to address the assignment argument, because Plastic Plate is entitled to summary judgment on the claim regardless.

*Ownership*

The first element of a conversion claim is ownership. Revere – standing in Whirlpool's shoes for the conversion claim – contends Plastic Plate retained Whirlpool's property (the tooling). Plastic Plate responds that it merely retained property Plastic Plate itself owned. Plastic Plate has presented uncontradicted evidence in support of its position, and thus is entitled to summary judgment.

Plastic Plate cites the testimony of Michael Hall, who oversaw rack maintenance for Plastic Plate. *See* Doc. 79-8, at 13. Specifically, Hall testified Plastic Plate already had the attachment arms, and requested its fabricator, American Rack, attach them to the chrome plating inserts Whirlpool paid for:

Q:    Okay. Plastic Plate received them with - - received the chrome plating racks
        with the attachment arms already bolted, right?

23

A:      Yeah, yeah, we gave them - - we gave them that stuff. And then they put them on there.

Q:      When you say you gave them that stuff - -

A:      We gave them the - - the disconnects, the - - my design.

Q:      Design, not physically - - you didn't physically - - Plastic Plate didn't physically send a bunch of already manufactured attachment arms to American Rack, right?

A:      Yes, yes we did.

Q:      Oh, you did?

A:      Yes.

Q:      So Plastic Plate had sitting in its facility actually manufactured attachment arms?

A:      Yes.

Q:      And those were sent to American Rack.

A:      Yes.

Q:      And added to the chrome plating racks?

A:      Correct.

Q:      Okay. So were those from the prior project that you discussed previously?

A:      Yes, we built advance - - we built some in advance for future - - so we had them on hand.

Q:      Okay. So - - I thought you said earlier that you had sat down with Todd and shown him a drawing of these attachment arms some time [sic] in 2013.

A:      Yes.

Q:      Okay.

A:      For another company. We built them for another - - one of our other companies.

24

Q:      Right. So when you did that, did Plastic Plate physically manufacture attachment arms for that project or was it American Rack that manufactured them?

A:      We asked - - we asked them to manufacture them for us and give them to us. We have them on the shelf.

Q:      Okay. But for the Alpha 16 Program, you are saying you didn't ask American Rack to do that because Plastic Plate already had these arms manufactured?

A:      Yes.

(Doc. 79-8, at 5-6). He further testified Whirlpool (through Revere) purchased only "[t]he insert - - the outside frame, the insert and the three clips", but not "[t]he attachment features". *Id.* at 11-12. Further, Hall explained when he provided a cost estimate for the quote for the insert for the Alpha Program, that estimate was for "[j]ust the outside frame and the three clips…[T]he rest of it is ours. The attachment features are my design and they are Plastic Plate's." *Id.* at 18-19. He testified specifically that both the cross members and attachment arms were Plastic Plate's property. *Id.*

In response, Revere contends it is "undisputed that Whirlpool . . . owned the Racks." (Doc. 78, at 21); *see also* Doc. 73, at 26. But the evidence to which Revere points fails to establish that Whirlpool had any ownership right to the parts retained by Plastic Plate. Revere first cites two emails from Plastic Plate representatives to Revere representatives. In the first, Lacks requests that Revere "make arrangements to have all Whirlpool owned tooling exited from PPL facilities". (Doc. 74-10). In the second, Leland wrote once invoices are paid "PPL will have all customer owned tooling available for pick up". (Doc. 74-18). These emails provide no clarification, however, and merely beg the question of what constitutes the "Whirlpool owned tooling." Revere next points to the following exchanges at Lacks's deposition, discussing those emails:

Q:      So you agree that the tooling belonged to Whirlpool?

25

A:      I guess you would have to better define what you mean.

Q:      Was the tooling owned by Plastic Plate, Revere or Whirlpool?

A:      Whirlpool owned tooling is owned by Whirlpool.

Q:      The tooling for the Alpha program that was at Plastic Plate's facility, was it owned by Plastic Plate, Revere or Whirlpool?

A:      The specific tooling to the Alpha '16 program that was paid for through a purchase order by Revere would have been Whirlpool's own tooling.

Q:      Not Plastic Plate, right?

A:      Correct.

                                    * * *

Q:      And then the chrome rack, plating racks, those were returned to Revere with modifications done to them?

A:      No.

Q:      Was anything removed from the chrome plating racks?

A:      Can we reference Exhibit 19? To my knowledge, it was removed for the attachment arms [sic] that had no utility use for the next organization that would be using it for plating.

Q:      So those were removed before giving the racks to Revere, right?

A:      They were removed, yes, before they were shipped.

        MR. DeWAARD:      For the record, Exhibit 19 has photographs number Plastic Plate 12049 through 12058.

. . .

Q:      They were not – Plastic Plate 0012051, these are not owned by Plastic Plate.

(Doc. 73-24, at 29, 35). The photograph identified – Plastic Plate 00112051 – depicts a chrome

plating insert with the three clips circled. *See* Doc. 71-26. There is no dispute that these clips were

owned by Whirlpool, and were returned attached to the inserts. The Court finds Revere has failed

26

to demonstrate a genuine issue of material fact as to the first element – Whirlpool's ownership of the cross members and attachment arms that Plastic Plate removed from the inserts and retained.[10] As such, Plastic Plate is entitled to summary judgment on the conversion claim based on Plastic Plate's retention of those pieces. Although it is undisputed that Whirlpool owned the outside portion of the inserts, for the reasons discussed below, Revere has failed to show those were converted, or that Whirlpool was damaged.

*Conversion*

The second element of a conversion claim is defendant's conversion by a wrongful act or disposition of plaintiff's property. *Kuvedina, LLC*, 946 F. Supp. 2d at 761. As set forth above, Revere has failed to establish that Whirlpool owned the pieces Plastic Plate retained. Moreover, Revere has not presented evidence that Plastic Plate's removal of the cross members and attachment arms damaged or impacted the value of the Whirlpool-owned chrome plating inserts. Plastic Plate presents evidence, in the form of Hall's deposition testimony, that in his 30 years of experience, no plater used another plater's racks. (Doc. 79-8, at 20-21). Moreover, Hall further testified that the inserts returned to Revere could still have been used to plate parts:

Q:      As the frame of the inserts were returned to Revere, do you believe they could have been used to plate parts?

A:      Yes.

Q:      Why is that?

A:      They could just put four holes in it, used a bracket to attach to a rack, and it's ready to go.

_____

10. Revere's attempts to reframe Plastic Plate's argument as a "trade secret" argument are unpersuasive. Plastic Plate's argument before this Court is based on retention of parts owned rather than retention of parts in which it has a trade secret. *See* Doc. 71, at 21-25. The undersigned thus need not reach this straw man argument. Although Hall testified at his deposition that the insert/frame system was proprietary, *see, e.g.*, Doc. 73-20, at 6, this is not the basis of Plastic Plate's argument.

Q:      So they still have a frame into which a part would fit?

A:      Yes, yep.

Q:      And the part fits into the clips?

A:      Yes.

Q:      And the clips remain on the frame?

A:      Yep.

Q:      And the electricity flows through the clips?

A:      Yes.

Q:      And the part gets plated?

A:      Yes.

Q:      So all they would need to do was to attach the frame of the insert to another structure to run through their lines?

A:      Yes.

(Doc. 79-8, at 19-20).

Revere responds that the inserts "were no longer usable after Plastic Plate destroyed them", citing Price's deposition testimony. (Doc. 78, at 22 n.6); *see also* Doc. 73, at 27 ("The Racks were no longer useable after Plastic Plate sawed off the tops and destroyed them"). Price in fact testified to this, but also stated she lacked personal knowledge of plating racks and did not know if they could have been used absent Plastic Plate's modification:

Q:      So Revere, it turns out, could not use the plating racks that Plastic Plate delivered to Revere, correct?

A:      Based on the damages Plastic Plate did to the racking, yes.

Q:      Could Revere have used the chrome plating racks delivered by Plastic Plate even if they hadn't been damaged as you said?

A:    We are not able to answer that based on receiving them not complete.

Q:    Did Revere endeavor at any time to figure out whether the plating racks were usable by another plating company?

\* \* \*

A:    If you're asking could another plater use those racks, potentially. I mean, I can't answer that question based on not having the full rack intact and it's not a pliable answer anyway because no one can use them once they're cut in the form and fashion that they were.

Q:    \* \* \* What I'm asking is, did Revere make any effort to determine whether the racks could be used by another plating company if the tabs had not been cut off them?

A:    Yes. I know we took pictures and requested if another chrome plater could do that. Unfortunately, we ran out of time in order to get parts up and running to produce the parts for Whirlpool's manufacturing line.

Q:    Was Revere told in advance that the chrome plating racks couldn't be used by another plating manufacturer?

A:    That they could not?

Q:    Correct.

A:    No.

(Doc. 73-25, at 3). Price further testified she was not an expert on plating and lacked knowledge regarding: (1) whether one plater can use another plater's racks (stating she "would *assume* some platers have the capabilities to reutilize existing racks") (emphasis added); (2) Plastic Plate's specific inserts in particular or whether other platers could use them; or (3) whether the parts Plastic Plate removed were part of what Whirlpool paid for ("I would assume they would be Whirlpool owned, but again, I don't know their design"). (Doc. 79-7, at 3-5). Again, the evidence Revere points to does not establish a genuine issue of material fact. Price's testimony is essentially that Revere *did not know* if the racks were still usable or would have been used by any manufacturer had Plastic Plate not taken the action it did. This is not evidence Plastic Plate's actions destroyed,

29

or even impaired, the value of the inserts owned by Whirlpool. Whatever value the inserts did, or did not have, Revere has not shown a genuine issue of material fact that Plastic Plate's actions converted Whirlpool's property.

*Damages*

Finally, Revere has also completely failed to demonstrate Whirlpool (from which the claim was assigned), suffered any damages from the alleged conversion. Rather, Revere argues that Revere itself suffered damages. *See* Doc. 73, at 28 ("Revere had to buy replacement racking to continue its supply obligations to Whirlpool. This caused damages that Revere is entitled to recover.").

In bringing this claim assigned by Whirlpool, Revere, as the assignee, "stands in the shoes of the assignor [Whirlpool] . . . and succeeds to all the rights and remedies of the latter". *Inter Ins. Exchange of Chicago Motor Club v. Wagstaff*, 144 Ohio St. 457, 460 (1945). Revere has failed to provide any evidence that the racks, with or without the pieces Plastic Plate removed, had any value to Whirlpool. Whirlpool's representative testified that she "[did] not specifically recall any instance where Whirlpool would have taken ownership of a plating rack". (Doc. 72-15, at 2-3). Moreover, to the extent there was damage from the need for new racks or inserts, Whirlpool did not suffer that damage, Revere did.

Failure to provide evidence of damages alone is sufficient to grant summary judgment on a conversion claim. *See Bender v. Logan*, 76 N.E.3d 336, 359 (Ohio App. 2016) ("Even if we assume for purposes of argument that Howard's exercise of control was wrongful, the record does not contain any evidence that appellants suffered damages by Howard retaining their employment agreements or by safekeeping Trina's stock certificate. . . . Consequently, the trial court did not improperly enter summary judgment in Howard's favor regarding appellants' conversion claim.").

For all of these reasons, the Court finds Revere has failed to show a genuine issue of material fact as to conversion and therefore grants Plastic Plate summary judgment on the same.

Unjust Enrichment & Civil Theft

Revere's Complaint also asserts claims for unjust enrichment and civil theft. *See* Doc. 1-1, at 15. Plastic Plate is also entitled to summary judgment on these claims.

Per the Ohio Supreme Court, "unjust enrichment . . . occurs when [a person] has and retains money or benefits which in justice and equity belong to another." *Hummel v. Hummel*, 14 N.E.2d 923, 927 (1938). To make out a claim of unjust enrichment, the plaintiff must establish: "(1) a benefit conferred by a plaintiff upon defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hoffer v. Cooper Wiring Devices, Inc.*, 2007 WL 1725317, at *4 (N.D. Ohio).

For civil theft, Ohio Revised Code §§ 2307.60 and 2307.61, "creates a statutory cause of action for damages resulting from any criminal act." *Jacobson v. Kaforey*, 149 Ohio St. 3d 398, 400 (2016). The criminal theft statute, Ohio Revised Code § 2913.02, provides, in relevant part:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;
(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

Ohio Rev. Code § 2913.02.

Applying these principles means these claims fail for the same reasons set forth as to the conversion claim above. Plastic Plate did not retain any benefit from Whirlpool which it would be unjust for it to retain, *see Hoffer*, 2007 WL 1725317, at *4, nor did it deprive Whirlpool of any

31

property, *see* Ohio Rev. Code § 2913.02(A). As such Plastic Plate is also entitled to summary judgment on these claims.[11]

Tortious Interference with Business Relationship or Contract

Plastic Plate further contends it is entitled to summary judgment on Revere's tortious interference with contract claim. *See* Doc. 71, at 24-25. Revere does not respond to this argument. *See* Doc. 78. Plastic Plate is also entitled to summary judgment on this claim.

"To prove a claim of tortious interference with contract, a plaintiff must establish (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Long v. Mount Carmel Health Sys.*, 93 N.E.3d 436, 445 (Ohio 2017). Proof of damages is a necessary element. *See Koury v. City of Canton*, 221 F. App'x 379, 387 (6th Cir. 2007) (affirming grant of summary judgment because plaintiff failed to present "any evidence of damages" resulting from the alleged tortious interference).

Further, the Ohio Supreme Court has explained: "It is well established that 'though a breach of a duty under a contract or lease necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference.'" *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St. 3d 36, 46–47 (1989) (quoting *Cherberg v. Peoples Nat'l Bank of Wash.*, 88 Wash. 2d 595, 604 (1977)). An exception to this general rule "exists, and a tort action may lie, only where the breaching party indicates, by [its] breach, a motive to interfere with the adverse party's business

---

11. The Court further disagrees with Revere's contention that Plastic Plate has waived its right to challenge these claims on summary judgment by raising the argument in a footnote. Given the close relationship between such claims, Plastic Plate's argument was sufficiently specific. *See* Doc. 71, at 23.

relations rather than an interference with business resulting as a mere consequence of such breach." *Id.*

Plastic Plate contends that "Revere can present no evidence that Plastic Plate's alleged breach – its decision to stop accepting releases for shipment of parts – was motivated by a malicious intent to interfere with Revere's relationship with Whirlpool." (Doc. 71, at 24). Revere has not pointed to any such evidence. Further, Plastic Plate points out that Revere has presented no evidence of damages, even if the claim could proceed as an independent tort claim. Price, Revere's corporate representative, testified she was not aware of any specific damage to Whirlpool's relationship with Revere based on Plastic Plate's actions. *See* Doc. 72-13, at 10-14. And Revere's Sales Manager for Whirlpool, Countess, testified he did not recall any direct repercussions with Whirlpool from Plastic Plate's actions. *See* Doc. 72-3, at 9. Again, Revere points to nothing to the contrary.

Because Revere has failed to establish a genuine issue of material fact as to its tortious interference with contract claim, Plastic Plate is entitled to summary judgment on the same.

Attorneys Fees

Finally, Revere argues it is entitled – by contract – to its attorneys fees. Because, as set forth above, Revere's breach of contract claim fails, so must its attorney fee claim.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is hereby

ORDERED that Plastic Plate's Motion for Summary Judgment (Docs. 68, 69) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Revere's Motion for Summary Judgment (Doc. 73) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Plastic Plate's Motion for Leave to File Sur-Reply (Doc. 91) be, and the same hereby is, DENIED.

 s/ *James R. Knepp II*                   
UNITED STATES DISTRICT JUDGE